# Illinois Official Reports

## Appellate Court

---

### *In re Vincent K.*, 2013 IL App (1st) 112915

---

| | |
|---|---|
| Appellate Court Caption | *In re* VINCENT K., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. Vincent K., Respondent-Appellant). |
| | |
| District & No. | First District, Fourth Division<br>Docket No. 1-11-2915 |
| | |
| Filed<br>Rehearing denied | December 12, 2013<br>January 10, 2014 |
| | |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The trial court properly granted the State's motion to strike the postconviction petition filed by respondent, a minor adjudicated a delinquent based on his commission of first degree murder when he was 13, on the ground that the Post-Conviction Hearing Act does not apply to juveniles in proceedings under the Juvenile Court Act, since the Post-Conviction Hearing Act clearly applies only to those "imprisoned in the penitentiary," respondent's equal protection argument failed in the absence of any showing that he was "similarly situated" as an imprisoned adult, and despite the lack of some means of obtaining relief, the public policy of Illinois does guard minors' rights and allows a court to intervene on its own motion in response to substantial errors. |
| | |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 07-JD-946; the Hon. Richard F. Walsh, Judge, presiding. |
| | |
| Judgment | Affirmed. |

| Counsel on Appeal | Abishi C. Cunningham, Jr., Public Defender, of Chicago (James S. Jacobs, Assistant Public Defender, of counsel), for appellant. |
| | |
| | Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg and Tasha-Marie Kelly, Assistant State's Attorneys, of counsel), for the People. |
| | |
| | Laura H. Nirider and Joshua A. Tepfer, both of Bluhm Legal Clinic, Northwestern University School of Law, of Chicago, *amicus curiae*. |
| | |
| Panel | JUSTICE FITZGERALD SMITH delivered the judgment of the court, with opinion. |
| | Presiding Justice Howse and Justice Lavin concurred in the judgment and opinion. |

**OPINION**

¶ 1    Respondent Vincent K., a juvenile currently confined in the Juvenile Department of Corrections, was adjudicated delinquent based on a petition alleging he committed first degree murder. The case was designated for extended juvenile jurisdiction (EJJ). Respondent appeals from an order of the circuit court granting the State's motion to strike his postconviction petition based on the claim that the Post-Conviction Hearing Act (the Act) (725 ILCS 5/122-1 *et seq.* (West 2010)) does not apply to juveniles in proceedings under the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/1-2 *et seq.* (West 2010)).[1] For the following reasons, we affirm.

¶ 2                                    I. BACKGROUND

¶ 3    On February 22, 2007, when respondent was a 13-year-old eighth-grader,[2] he was involved in an altercation which culminated with him stabbing a fellow eighth-grade student.[3] The

---

[1] We note for the record that the Center on Wrongful Convictions of Youth of the Northwestern University School of Law, Bluhm Legal Clinic, filed an *amicus curiae* brief in this matter. Additionally, we are in receipt of the State's brief filed in response to issues raised by respondent in his reply brief and argued at oral arguments. This response by the State is made a part of the record on appeal.

[2] Vincent's date of birth is August 1, 1993.

[3] A portion of the fact section of this opinion is taken from the previous Rule 23 order issued by this court in *In re V.K.*, No. 1-08-3012 (2009) (unpublished order under Supreme Court Rule 23).

victim, Ricky Hernandez, died of his injuries nine days later. The State filed an amended petition for adjudication of wardship, charging respondent with delinquency based on his commission of first degree murder. After a hearing, the circuit court granted the State's motion to designate the case as an extended jurisdiction juvenile prosecution pursuant to section 5-810 of the Juvenile Court Act of 1987 (705 ILCS 405/5-810 (West 2010)).

¶ 4                                    A. The Adjudication Proceeding

¶ 5      In the EJJ proceeding, testimony established that February 22, 2007, was respondent's second day as an eighth-grade student at Heritage Middle School (Heritage), to which respondent had transferred from a special education school in Du Page County. Because respondent was new to Heritage, a teacher introduced him to another eighth-grade student, Yazmin Renteria. Renteria helped respondent with his locker and then went to her classes.

¶ 6      Renteria testified that at lunch, she saw respondent and the victim swearing at one another and having an "angry" discussion. Renteria stated that respondent and the victim yelled at one another for two to three minutes before going their separate ways.

¶ 7      Renteria further testified that, before eighth period, she went to her locker and saw respondent and the victim swearing at one another again. Renteria and two other students intervened to prevent the argument from becoming physical. Respondent and the victim agreed to meet after school for a fight. The victim went to class and respondent went to his locker, where Renteria overheard him saying that the victim "has something coming for him." Later that day, the victim told Renteria that he was going to walk home with his girlfriend, Gesele, and that he was not going to fight respondent unless respondent approached him first.

¶ 8      After school, Renteria walked outside with respondent and another student, Francisco Temblador. As they were walking, another student, Josh Lopez, approached respondent and told him that, if he wanted to fight, he should approach the victim. Renteria testified that respondent hesitated, then decided to "get it over with" and walked toward the victim's location. As they walked, Renteria saw Temblador hand respondent a blue object. Renteria testified that another person who was with them told her the object was a blue ink pen.

¶ 9      Renteria saw the victim standing near an alley behind a church. Respondent challenged the victim to fight. The victim walked over, threw the first punch, and hit respondent three times in the face. Meanwhile, 15 to 20 people were milling about, watching the fight.

¶ 10     Renteria testified that respondent punched the victim. The victim stepped back, slipped on a patch of ice, and fell to his hands and knees. Respondent then "went under him and started stabbing him." The victim got back to his feet, started to walk toward the alley, and collapsed. Respondent swung his knife in the air and said he was "going to kill everybody." A woman in a pickup truck drove by and told respondent to get in the truck. Respondent complied.

¶ 11     Gesele Quintero testified that she was the victim's girlfriend. On February 22, 2007, when she and the victim met after school, the victim told her that "some kid wanted to fight with him." Quintero told him not to fight, and they started to walk home together. As they were walking, some people called to the victim and told him that respondent was waiting to fight

him. The victim initially told them he was not going to fight, but changed his mind and told Quintero the fight would be over quickly and then they could go home.

¶ 12    Quintero testified that 10 to 20 students from Heritage Middle School began walking toward the victim, and then, "out of nowhere," respondent got "in [the victim's] face, saying something to him." The victim hit respondent, and they began fighting. The other students stood around watching the fight.

¶ 13    Quintero further testified that she had a difficult time seeing the fight because all of the students were surrounding the victim and respondent. Eventually, the victim fell down. Quintero saw respondent punch the victim, then heard other students scream, "he is bleeding." Quintero saw the victim holding his chest while respondent, standing in the middle of the street, screamed, "this is what you get when you mess with kings." One of the victim's friends walked toward respondent and asked him, "how can you stab somebody? This is supposed to be a one-on-one fight." At that point, Quintero saw a knife in respondent's hand. Respondent then got into a pickup truck and drove off.

¶ 14    Chicago police detective Joseph Green testified that, at 3:30 p.m. on February 22, 2007, he was called to the crime scene. When he arrived, the victim collapsed into Detective Green's arms. Detective Green was informed that the victim had been stabbed. He performed CPR on the victim, who was eventually transported to the hospital.

¶ 15    Chicago police officer Joseph Fitzgerald testified he recovered a knife from the crime scene. The parties stipulated that, if called to testify, forensic scientist Christopher Webb would testify that he found blood on the knife recovered by Officer Fitzgerald, as well as on clothes recovered from respondent. The parties also stipulated that, if called to testify, forensic scientist and expert in the area of DNA analysis Heather Ralph would testify that the victim could not be excluded as the person whose blood was on the recovered knife, and only 1 in 33 billion Hispanics could not be excluded as that individual. The parties further stipulated that, if called to testify, forensic pathologist Dr. Valerie Arangelovich would testify that the victim died from multiple stab wounds.

¶ 16    After the State rested, respondent called Francisco Temblador.[4] Temblador testified that, on February 21, 2007, he was at his locker when he overheard some students saying they thought respondent was a gang member and they were going to "jump him after school." At home that evening, Temblador noticed that the victim had left him a comment on his MySpace page stating that Temblador should tell respondent, "I said he is a flakke." Temblador explained that the term "flakke" meant "King Killer." Temblador testified he called respondent and told him about the victim's comment. He also told respondent that some students were planning on jumping him.

¶ 17    Temblador further testified that he was in the school lunchroom the following day when he saw the victim approach and speak with respondent. Temblador could not hear what was being

---

[4]Temblador, another Heritage Middle School student, is respondent's uncle, although respondent refers to him as his cousin. It was Temblador's mother (and respondent's older sister) who picked respondent up in the pickup truck after the stabbing.

said. Afterward, respondent told Temblador the victim had been "talking crap" and had told him he "better watch his back."

¶ 18     Temblador testified that after school, he and respondent met at their locker and stalled for five minutes so the rest of the students could "clear out" from the front of the school. Then, they walked up 31st Street to Oak Park Avenue. As they walked, Aaron Avila approached them and told them the victim was waiting in the alley to fight. Respondent told Aaron he did not want to fight. Aaron insisted respondent should fight the victim and "get it over with." Temblador and respondent then crossed Oak Park Avenue and walked toward a church on the corner of Euclid Avenue. Respondent told Aaron he was not going to fight the victim because there were 20 kids standing around and he was afraid they would all "jump" him. Aaron walked away toward the alley. Soon after, the victim walked up and hit respondent three times on the side of his head. The crowd of kids formed a circle around them and told the victim to "whip his ass, kick his ass." Temblador's mother then drove up and told Temblador and respondent to get in her truck. As they got into the truck, one of the crowd members walked over to respondent and called him "King Killer" and "flakke." Temblador testified that he then noticed respondent's hands were bleeding and that he had a blue-handled knife.

¶ 19     Sabina Hernandez testified that she is Temblador's mother and respondent's older sister. Hernandez testified respondent was a former special education student who, when he was 11 years old, suffered a head injury that caused bleeding on his brain. Respondent then transferred to Heritage so "he could have a normal graduation with kids of his own age."

¶ 20     Hernandez testified that on February 22, 2007, she drove her pickup truck around looking for Temblador and respondent so they could help her clean out her garage. As she turned right onto 31st Street heading toward Heritage, she saw a crowd of 25 kids on her left. The kids were in a circle and Hernandez thought there must be a fight. Then, she saw respondent emerge from the circle. Hernandez told him to get in the pickup truck. At the same time, one of the kids, Chris Rousary, slapped respondent, called him a "King Killer," and threatened to kill him. Another student grabbed at respondent, while other members of the crowd said, "kick his ass."

¶ 21     Hernandez testified that she drove away with both respondent and Temblador. Soon after, the police pulled her over. Hernandez did not see respondent with a knife and did not know the victim had been stabbed until they got to the police station.

¶ 22     Respondent also testified in his own defense. He testified that, on February 21, 2007, he was a 5-foot-5-inch-tall middle schooler who weighed approximately 110 pounds. It was his first day as a student at Heritage and many students gave him "threatening looks." After school, Temblador telephoned respondent and told him about the MySpace message from the victim. He also told respondent that other kids were talking about "jumping" him. Respondent testified he felt scared because he thought he might get killed or "beat up real bad." As a result of this fear, he brought a pocket knife to school the following day.

¶ 23     The next day at school, respondent heard "two big kids" say "king killer" as they passed him in the hallway. Later, while respondent was sitting at a table in the lunchroom, the victim said to him, "King Killer, watch your back." Respondent knew this was the same person who had threatened him on MySpace.

¶ 24   Respondent testified that he was hesitant to leave the building after school was over because he thought the victim and other students wanted to fight him. Eventually, he and Temblador left the school together. As they walked, Aaron approached him and asked if he was going to fight. Respondent said no. As they approached a church, Aaron asked him to go into the alley and fight. Respondent again said no. After Aaron walked into the back of the alley, the victim ran up to respondent and hit respondent on the head. There were 25 kids standing around screaming, yelling, and coming closer. The victim pulled respondent's coat over his head so he could not see very well. Respondent could hear people yelling, "F*** him up, King Killer."

¶ 25   Respondent testified that he then pulled his knife out, intending to scare the kids back. Respondent swung the knife and stabbed the victim. He then heard his sister, Hernandez, screaming his name and he started walking toward her pickup truck. He could hear the other kids following him, saying, "King Killer, bitch, come get some, f*** you up, I'll kill you." Respondent was "freaking out" and he threw the knife. He and Temblador entered the pickup truck.

¶ 26   The State called Christian Rousary in rebuttal. Rousary testified he was saw the fight between respondent and the victim. He testified that respondent "had his back turned towards [the victim] while [the victim] was swinging at him. He turned around and *** stabbed [the victim]." The victim held his chest, stumbled away, and fell down. Rousary was angry and he and his friend Nick walked toward respondent. As they approached, respondent held his arms up with two fists extended over his shoulders, the knife still in one hand, and said, "I'm a king. I'll stab all of you."

¶ 27   After arguments by the parties, the court issued its ruling, finding respondent guilty of first degree murder. After aggravation and mitigation, as well as reports from both the juvenile and adult probation departments, the court adjudicated respondent a ward of the court and committed him to the Juvenile Department of Corrections for a period of time not to exceed his twenty-first birthday. Pursuant to the EJJ statute, the court also imposed an adult sentence of 30 years in the Illinois Department of Corrections in the event respondent did not complete his delinquency sentence successfully. A motion to reconsider respondent's sentence was filed and denied.

¶ 28   We note here for the record that, in his reply brief on appeal, respondent acknowledges he "was released from custody on June 20, 2013, one month shy of his 20th birthday. This is six years, three months and 30 days. He is still on electronic monitoring."[5]

¶ 29                                B. The Direct Appeal

¶ 30   Respondent appealed, arguing: (1) the court abused its discretion in designating the prosecution an EJJ; (2) the State failed to prove him guilty of first degree murder where the

_____

[5]This fact apparently does not give respondent pause or cause him to consider his appeal here moot. Rather, respondent argues, "[h]ad he been allowed to proceed [in his postconviction process] and had he been successful, he could have avoided having to graduate high school while confined in a juvenile detention center."

court improperly rejected his claim of self-defense, or that, in the alternative, he should have been convicted only of second degree murder; and (3) the court abused its discretion in imposing a 30-year adult sentence pursuant to the EJJ statute. *In re V.K.*, No. 1-08-3012 (2009) (unpublished order under Supreme Court Rule 23). This court affirmed respondent's adjudication of delinquency and sentence. *In re V.K.*, No. 1-08-3012 (2009) (unpublished order under Supreme Court Rule 23).

¶ 31                                C. The Postconviction Petition

¶ 32    In July 2010, respondent filed a motion to have counsel appointed to assist him in filing a request for postconviction relief. The court granted this motion and counsel was appointed. In May 2011, counsel filed a petition for postconviction relief on respondent's behalf. In the petition, respondent argued: (1) he was denied the effective assistance of appellate counsel where his appellate attorney failed to effectively argue that, where it was undisputed the victim first approached and then struck respondent to start the actual physical confrontation after school, the victim was the initial aggressor and, therefore, the appellate court should have considered whether respondent was guilty only of second degree murder based on an unreasonable belief in the need for self-defense; (2) his jury waiver was not knowingly obtained where respondent provided an affidavit to postconviction counsel stating he did not understand that it was his right to have a jury trial because his trial attorney failed to inform respondent of this personal right and the trial court's admonitions as well as the jury waiver colloquy were insufficient under the circumstances; and (3) the EJJ statute as applied in respondent's case is unconstitutional because it imposed a potential 30-year sentence on a 13-year-old juvenile without any regard to his rehabilitative potential or individual circumstances at the time of any future violation that might be used to trigger the adult sentence.

¶ 33    In June 2011, the State filed a motion to strike respondent's postconviction petition, arguing that the Act does not apply to juveniles. After arguments, the court granted the motion to strike, noting its hesitation in doing so:

> "THE COURT: All right. I agree with counsel to this extent that the amendments to the 1999 Juvenile Court Act and the decision *In re A.G.* certainly changed the attitudes or the view that we have to take of juvenile delinquency. And if I were able to write on a clean slate, it certainly would be my view that the Post Conviction Remedy Act should apply. However, I am a trial judge, and I'm not writing on a clean slate. I have case law, old case law, that holds that it does not apply. And those are, as counsel's pointed out before, the amendments to the Act. But you have cases after that. You have a case saying, well, you know, if–as I read it, saying that there's laws right now that doesn't apply, but if it's briefed properly, we'll reconsider it.
>
> And then you have *In re Jonathon*, and you have what's particularly persuasive is Justice Burke's dissent in which she says that the decision of the Supreme Court leaves a minor without a remedy because the Post Conviction Act does not apply.

So it seems to be that right now that they're holding that it doesn't, but they're going to look at it to determine whether that should be changed whether that 1979 case should be overruled.

But I think I have to construe with what the state of the law right now is. And I think the state of the law right now, while it's definitely unclear, is that it doesn't apply. And it leaves a minor without a remedy. So I am going to grant the motion to strike the petition.

And one of the reasons why I am doing that, I think it's going to be the fastest way to getting it up to, uh–get it fully briefed so that the decision can be decided."

¶ 34    Respondent appeals.

¶ 35                                    II. ANALYSIS

¶ 36    On appeal, respondent argues that, as a matter of law, the circuit court erred in granting the State's motion to strike his postconviction petition on the basis that the Act does not apply to juvenile proceedings. In support of this argument, respondent specifically contends: (1) the Juvenile Court Act does not prohibit a juvenile from seeking postconviction relief; (2) significant changes to the Juvenile Court Act in 1999 established that there is a "due process necessity" for extending the Act to juvenile proceedings, particularly in cases such as the one at bar, where the minor-respondent has been prosecuted in an extended juvenile jurisdiction prosecution; and (3) that not allowing juveniles the ability to file postconviction petitions leaves minors without a remedy to redress deprivations of their constitutional rights. We disagree.

¶ 37                    A. Juveniles and the Post-Conviction Hearing Act

¶ 38    The Post-Conviction Hearing Act provides a remedy to a criminal defendant whose federal or state constitutional rights were substantially violated in his original trial or sentencing hearing. *People v. Pitsonbarger*, 205 Ill. 2d 444, 455 (2002); 725 ILCS 5/122-1 *et seq.* (West 2010). An action for postconviction relief is a collateral attack upon a prior conviction and sentence, rather than a surrogate for a direct appeal. *People v. Tenner*, 206 Ill. 2d 381, 392 (2002). Proceedings are initiated by the filing of a petition verified by affidavit in the circuit court in which the conviction took place (725 ILCS 5/122-1(b) (West 2010)), and ultimately may consist of up to three distinct stages (*People v. Pendleton*, 223 Ill. 2d 458, 471-72 (2006)). If a petition is not summarily dismissed by the trial court, it advances to the second stage, where an indigent defendant is provided assistance by counsel. *People v. Hobson*, 386 Ill. App. 3d 221, 230-31 (2008). At the second stage, the petition under consideration must make a substantial showing of a constitutional violation or be subject to a motion to dismiss. See *People v. Vasquez*, 356 Ill. App. 3d 420, 422 (2005); 725 ILCS 5/122-5 (West 2010). If the State's motion to dismiss is denied, or no such motion is filed, the State must file a timely answer to the postconviction petition. 725 ILCS 5/122-5 (West 2010). If, upon consideration of the petition, with any accompanying documentation and in light of the State's answer, the

- 8 -

trial court determines that the requisite showing of a constitutional violation has been made, a third-stage evidentiary hearing must follow. *Hobson*, 386 Ill. App. 3d at 231.

¶ 39 Generally, a postconviction petition dismissed at the first stage of postconviction review is considered a summary dismissal, which is appropriate where the circuit court finds that the petition is frivolous and patently without merit (725 ILCS 5/122-2.1(a)(2) (West 2010)), *i.e.*, the petition has no arguable basis in either law or fact. *People v. Hodges*, 234 Ill. 2d 1, 11-12 (2009). To have no arguable basis, the petition must be based on an "indisputably meritless legal theory or a fanciful factual allegation." *Hodges*, 234 Ill. 2d at 16. In order for a defendant to circumvent dismissal at the first stage, he must allege the "gist" of a constitutional claim, which is a low threshold. *Hodges*, 234 Ill. 2d at 9-10. This standard requires only that a defendant plead sufficient facts to assert an arguable constitutional claim. *People v. Brown*, 236 Ill. 2d 175, 184 (2010). The summary dismissal of a postconviction petition is a legal question, which we review *de novo*. *Hodges*, 234 Ill. 2d at 9; *People v. Edwards*, 197 Ill. 2d 239, 247 (2001).

¶ 40 This petition, however, comes before us not after a consideration of the merits of the petition, but after a determination by the postconviction court to strike the petition because the petition was not proper where the Act does not apply to proceedings under the Juvenile Court Act. Because this is a question of law, our review is *de novo*. *Camco, Inc. v. Lowery*, 362 Ill. App. 3d 421, 428 (2005).

¶ 41 To seek designation of an adjudication proceeding as an extended juvenile jurisdiction proceeding, the State must allege: (1) the minor was at least 13 years old when he committed an offense that would be a felony if committed by an adult; and (2) there is probable cause to believe the allegations in the petition and motion are true. 705 ILCS 405/5-810(1) (West 2010).

¶ 42 Under the EJJ statute, the circuit court is required to impose both a juvenile sentence and "an adult criminal sentence in accordance with the provisions of Chapter V of the Unified Code of Corrections." 705 ILCS 405/5-810(4)(ii) (West 2010). The adult sentence only kicks in if the respondent violates the provisions of his juvenile sentence. 705 ILCS 405/5-810(4)(ii) (West 2010).

¶ 43 Here, to our knowledge, respondent has not violated the provisions of his juvenile sentence and, accordingly, his adult sentence has not kicked in. Therefore, we question whether respondent has standing to complain about the conditional adult sentence imposed by the circuit court. See, *e.g.*, *In re Phillip C.*, 364 Ill. App. 3d 822, 832 (2006). Under the EJJ statute, the "adult sentence is automatically stayed and will not be executed unless [respondent] violates the terms of his juvenile sentence." *In re Phillip C.*, 364 Ill. App. 3d at 832; 705 ILCS 405/5-810(4)(ii) (West 2010). Regardless, assuming respondent has standing, we find no error in the postconviction court's striking of respondent's petition.

¶ 44 While the purpose of the Juvenile Court Act is the rehabilitation of the minor (705 ILCS 405/5-101(c) (West 2010)), the purpose and policy section of the Juvenile Court Act has been amended to promote a juvenile justice system capable of dealing with the problem of juvenile delinquency, a system that will protect the community, impose accountability for violations of law, and equip juvenile offenders with competencies to live responsibly and productively (705

ILCS 405/5-101 (West 2010)). Enumerated purposes of the Juvenile Court Act now include to "protect citizens from juvenile crime," and to "hold each juvenile offender directly accountable for his or her acts." 705 ILCS 405/5-101(a), (b) (West 2010). Our supreme court has recognized that these amendments "represent a *** shift from the singular goal of rehabilitation to include the overriding concerns of protecting the public and of holding juveniles accountable for violations of the law." *In re J.W.*, 204 Ill. 2d 50, 69 (2003).

¶ 45    Both parties agree that this court has previously addressed the issue of whether a minor in a delinquency proceeding has a right to relief under the Act and has found that he does not. See *In re R.R.*, 75 Ill. App. 3d 494, 495 (1979); *In re A.W.H.*, 95 Ill. App. 3d 1106 (1981); see also *In re Buchanan*, 62 Ill. App. 3d 463, 465 (1978) (collateral attack via Post-Conviction Hearing Act unavailable to juvenile offenders); *In re Thomas*, 77 Ill. App. 3d 299, 300 (1979) (citing *In re Buchanan*, 62 Ill. App. 3d 463). In *In re R.R.* as well as *In re A.W.H.*, this court specifically held that minor-respondents do not fall within the parameters of the Act, which clearly defines who can seek relief under the Act, because proceedings in juvenile court are not criminal trials that result in convictions. See *In re R.R.*, 75 Ill. App. 3d at 495; *In re A.W.H.*, 95 Ill. App. 3d at 1108. We conclude these courts reached the correct result.

¶ 46    In *In re R.R.*, the Second District of this court was asked to determine whether a minor who had been adjudicated delinquent was entitled to postconviction relief. *In re R.R.*, 75 Ill. App. 3d at 495. The court began its analysis by reviewing the plain language of the Act:

> " 'Any person imprisoned in the penitentiary who asserts that in the proceedings which resulted in his conviction there was a substantial denial of his rights under the Constitution of the United States or of the State of Illinois or both may institute a proceeding under this Article.' " (Emphases omitted.) *In re R.R.*, 75 Ill. App. 3d at 495 (quoting Ill. Rev. Stat. 1977, ch. 38, ¶ 122-1 *et seq*.).[6]

The court discussed certain limitations on the right to file a postconviction petition, noting:

> "There is no statutory provision for a post-conviction petition in a delinquency proceeding brought under the Juvenile Court Act (Ill. Rev. Stat. 1977, ch. 37, par. 701-1 *et seq*.). It is also manifest that a proceeding under the Juvenile Court Act is not a criminal trial. The proceedings are commenced by the filing of a petition alleging delinquency and by the service of summons, not by the issuance of a warrant. Nor is the minor 'convicted' or 'sentenced.' In fact the Juvenile Court Act specifically provides that any adjudication under it shall not be '*** denominated a conviction.' (Ill. Rev. Stat. 1977, ch. 37, par. 702-9.) He may be committed to the Department of Corrections

---

[6]The current Post-Conviction Hearing Act (725 ILCS 5/122-1 (West 2010)) is nearly identical:

"§ 122-1. Petition in the trial court.

(a) Any person imprisoned in the penitentiary may institute a proceeding under this Article if the person asserts that:

(1) in the proceedings which resulted in his or her conviction there was a substantial denial of his or her rights under the Constitution of the United States or of the State of Illinois or both[.]" 725 ILCS 5/122-1 (West 2010).

- 10 -

but he is not given a 'sentence' for a definite time as is an adult." *In re R.R.*, 75 Ill. App. 3d at 495-96.

Ultimately, the court determined that the Act does not, in fact, extend to minors in juvenile proceedings, stating:

> "We refuse to extend this principle, which we do not deem applicable to hearings under the Juvenile Court Act. If we allow the use of section 122-1 proceedings in juvenile cases as a matter of right, as the defendant apparently contends, we are of the opinion that we would then walk further down the road of judicial piecemeal abolition of the Juvenile Court Act, which we do not wish to do. Additionally, such an extension could not help but contribute to a sense of uncertainty regarding the juvenile court system which would certainly not be in the best interests of this or any other minor." *In re R.R.*, 75 Ill. App. 3d at 496.

Because the Act did not apply to juvenile proceedings, this court found that the postconviction court erred in considering the minor's petition on the merits, where the petition was "without authority" in the first place. *In re R.R.*, 75 Ill. App. 3d at 497.

¶ 47　　Two years later, the Fifth District of this court addressed a very similar issue, wherein a minor who had been adjudicated delinquent filed a *pro se* postconviction petition. *In re A.W.H.*, 95 Ill. App. 3d at 1106. The postconviction court dismissed the petition because the Act did not apply to juvenile proceedings. *In re A.W.H.*, 95 Ill. App. 3d at 1107. The minor appealed. *In re A.W.H.*, 95 Ill. App. 3d at 1107. The *A.W.H.* court stated that *In re R.R.* was "correctly decided" and that the justices deciding *In re R.R.* "[used] sound reasoning and reached the correct result." *In re A.W.H.*, 95 Ill. App. 3d at 1108.

¶ 48　　These cases, *In re R.R.* and *In re A.W.H.*, have not been overruled, and they remain precedential. Respondent does not dispute this but, rather, argues that the continued validity of these cases is suspect following changes made in 1999 to the Juvenile Court Act. Specifically, respondent contends that "material changes in 1999 injected a punitive and retributive focus to juvenile proceedings which have altered the very character of the [Juvenile Court Act]." Respondent argues that his situation, that is, his delinquency proceeding in the context of the EJJ proceeding, fits even more clearly into an adult-type criminal context. The current version of the Juvenile Court Act, he argues, "has effectively criminalized the juvenile proceeding and thus eliminated the basis for denying juveniles a right to post-conviction relief."

¶ 49　　In *In re Jonathon C.B.*, 2011 IL 107750, in the context of considering whether juveniles should be afforded a jury trial, our supreme court rejected a similar argument from a minor-respondent that amendments to the Juvenile Court Act made juvenile proceedings more similar to adult trials than to delinquency hearings. *In re Jonathon C.B.*, 2011 IL 107750, ¶ 97. The court acknowledged that changes had been made to the Juvenile Court Act, but stated:

> "The argument that the change in terminology following the 1999 amendments renders the Act akin to the criminal justice system has been considered and rejected. In *People v. Taylor*, the court recognized that the 1999 amendments changed some of the terminology of the Act, so that the Act now provides for a number of features common

to a criminal trial. *People v. Taylor*, 221 Ill. 2d 157, 167 (2006). Nonetheless, the court recognized that:

> 'The policy that seeks to hold juveniles accountable for their actions and to protect the public does not negate the concept that rehabilitation remains a more important consideration in the juvenile justice system than in the criminal justice system and that there are still significant differences between the two, indicating that "the ideal of separate treatment of children is still worth pursuing." ' *Id*. at 170 (quoting *McKeiver* [*v. Pennsylvania*, 403 U.S. 528, 546 n.6 (1971)] (plurality op.))." *In re Jonathon C.B.*, 2011 IL 107750, ¶ 87.

The court continued, noting that it "has consistently rejected the argument that the amendments rendered the Act punitive and equivalent to a criminal prosecution." *In re Jonathon C.B.*, 2011 IL 107750, ¶ 91. Accordingly, respondent's argument that juvenile proceedings are now akin to adult trials such that the basis for denying juveniles a right to postconviction relief fails.[7]

¶ 50     In addition, respondent's contention that the Act should include juveniles is contradicted by the plain language of the Act itself, which requires a petitioner filing a postconviction petition to have a "conviction" prior to seeking postconviction relief. The cardinal rule of statutory construction is to ascertain and give effect to the true intent of the legislature. *In re D.D.*, 196 Ill. 2d 405, 418-19 (2001). Where the language is clear and unambiguous, a reviewing court may not depart from its plain meaning by reading into it exceptions that the legislature did not express. *Kraft, Inc. v. Edgar*, 138 Ill. 2d 178, 189 (1990). The Act provides:

> "§ 122-1. Petition in the trial court.
>
> (a) Any person *imprisoned in the penitentiary* may institute a proceeding under this Article if the person asserts that:
>
> > (1) in the *proceedings which resulted in his or her conviction* there was a substantial denial of his or her rights under the Constitution of the United States or of the State of Illinois or both[.]" (Emphases added.) 725 ILCS 5/122-1 (West 2010).

Juveniles who have been adjudicated delinquent are neither "imprisoned in the penitentiary," nor have they been "subject to proceedings which resulted in his or her conviction." See *In re Rodney H.*, 223 Ill. 2d 510, 520 (2006) ("Indeed, 'no suggestion or taint of criminality attaches to any finding of delinquency by a juvenile court.' " (quoting *In re Dow*, 75 Ill. App. 3d 1002, 1006 (1979), citing *People ex rel. Hanrahan v. Felt*, 48 Ill. 2d 171, 174-75 (1971))); accord *People v. Brazee*, 333 Ill. App. 3d 43 (2002). Accordingly, the plain language of the Act precludes juvenile respondents who have been adjudicated delinquent, such as respondent in the case at bar, from pursuing collateral relief via the postconviction process prescribed by the Act.

---

[7]But see, *e.g.*, *In re J.T.*, 221 Ill. 2d 338, 378 (2006) (Freeman, J., dissenting) ("[T]he changed climate in the treatment of minors in the juvenile court system advocates strongly for the application of the Post-Conviction Hearing Act.").

## B. Equal Protection

Respondent next argues that the "denial of the right of EJJ juveniles in the Juvenile Department of Corrections *** to take advantage of the [Post-Conviction Hearing Act] violates the equal protection rights of juveniles since adults who are similarly situated are able to take advantage of the protections of the [Post-Conviction Hearing Act]." He argues that there is neither a rational basis nor a compelling State interest for "this distinction between similarly situated individuals."

To state a cause of action for a violation of equal protection, a plaintiff must allege that there are other people similarly situated to him, that these people are treated differently than him, and that there is no rational basis for this differentiation. See *Safanda v. Zoning Board of Appeals*, 203 Ill. App. 3d 687, 695 (1990); accord *Kaczka v. Retirement Board of the Policemen's Annuity & Benefit Fund*, 398 Ill. App. 3d 702, 707-08 (2010). "The equal protection clause does not forbid the legislature from drawing proper distinctions in legislation among different categories of people, but it does not prohibit the government from doing so on the basis of criteria wholly unrelated to the legislation's purpose." *In re Jonathon C.B.*, 2011 IL 107750, ¶ 116. Where, as here, a fundamental right is not at issue, the court applies a rational basis scrutiny, considering whether the challenged classification bears a rational relationship to a legitimate government interest. *In re Jonathon C.B.*, 2011 IL 107750, ¶ 116.

Here, respondent's argument fails because it is based on a faulty premise, that is, that minors who have been adjudicated delinquent are "similarly situated" to adults who are imprisoned after having been convicted of a crime. Respondent, thus, cannot reach the requisite threshold of "similarly situated" required to state an equal protection claim. Rather, respondent is a minor who has been adjudicated delinquent. Unlike an adult who has been convicted of a felony and can then pursue collateral relief via the postconviction process, respondent does not have a criminal conviction on his record. As discussed above, respondent, who, even if he fails to complete his juvenile adjudication properly may be subject to an adult sentence, does not yet have a criminal conviction. See *In re Rodney H.*, 223 Ill. 2d at 520 ("Indeed, 'no suggestion or taint of criminality attaches to any finding of delinquency by a juvenile court.' " (quoting *In re Dow*, 75 Ill. App. 3d at 1006, citing *People ex rel. Hanrahan*, 48 Ill. 2d at 174-75)); accord *Brazee*, 333 Ill. App. 3d 43. Accordingly, for purposes of respondent's equal protection argument, we find that respondent is not "similarly situated" to imprisoned adults, and his equal protection argument fails.

## C. Other Remedies

Respondent also argues that the Act should apply to juveniles because, without the possibility of filing a postconviction petition for relief, a juvenile is left without other remedy, a "fundamental unfairness" because the juvenile is unable to proceed in a collateral attack. Because of this resulting unfairness, argues respondent, "[t]his Court should conclude that events in the past 30 years have altered the landscape sufficiently to determine that this Court should examine the matter, as the trial court wished to do below, with a 'clean slate' and not be beholden to antiquated precedent." The State responds that respondent is not without remedy,

as he could file a petition for relief under section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2010)).

¶ 57    Section 2-1401 of the Code provides a comprehensive statutory procedure by which final orders, judgments, and decrees may be vacated after 30 days from their entry. *People v. Vincent*, 226 Ill. 2d 1, 7 (2007); see also *People v. Haynes*, 192 Ill. 2d 437, 460 (2000). Although a section 2-1401 petition is usually characterized as a civil remedy, its remedial powers extend to criminal cases. *Vincent*, 226 Ill. 2d at 7.

¶ 58    In considering a section 2-1401 petition, the court must determine whether facts exist that were unknown to the court at the time of trial and would have prevented judgment against the defendant. *People v. Welch*, 392 Ill. App. 3d 948, 952 (2009). To be entitled to relief under section 2-1401, a defendant must set forth specific factual allegations supporting each of the following elements: (1) the existence of a meritorious defense or claim; (2) due diligence in presenting this defense or claim to the circuit court in the original action; and (3) due diligence in filing the section 2-1401 petition for relief. *People v. Pinkonsly*, 207 Ill. 2d 555, 565 (2003).

¶ 59    Although we agree with the State that a section 2-1401 petition for relief may be available to juveniles in particular instances, a section 2-1401 petition does not afford the same breadth of relief as does a petition for relief under the Act. For example, in the context of a delinquent juvenile's appeal being dismissed for failure to comply with the written motion requirements of Rule 604(d), our supreme court found that a 2-1401 petition was inadequate to preserve the minor's claims. *In re William M.*, 206 Ill. 2d 595, 604-05 (2003). The court stated:

> "The State contends that juveniles would not be left without a remedy in this situation because they could present their claims in a section 2-1401 motion [citation]. Section 2-1401 of the Code of Civil Procedure, however, does not provide a juvenile defendant with a remedy equivalent to the Post-Conviction Hearing Act. Although the remedial powers of section 2-1401 have been held to extend to criminal cases, such a motion is intended 'to correct all errors of fact occurring in the prosecution of a cause, unknown to the petitioner and court at the time judgment was entered, which, if then known, would have prevented its rendition.' *People v. Haynes*, 192 Ill. 2d 437, 461 (2000). A juvenile's claim that his counsel was ineffective for failing to file a written motion pursuant to Rule 604(d) does not fall within those parameters. Moreover, a section 2-1401 petition is not intended to provide for a general review of all trial errors or as a substitute for a direct appeal. *Haynes*, 192 Ill. 2d at 461, quoting *People v. Berland*, 74 Ill. 2d 286, 314 (1978). Consequently, we find that section 2-1401 is not adequate to preserve a juvenile's claims on appeal when his attorney fails to comply with the written motion requirement of Rule 604(d)." *In re William M.*, 206 Ill. 2d at 604-05.

¶ 60    Accordingly, we reject the State's position that a section 2-1401 petition affords a juvenile offender the same relief as does a petition under the Act. In so doing, we recognize Justice Kilbride's special concurrence in *In re William M.*, in which he opined, in part, that the question of whether the Act applies to juveniles should be addressed by the supreme court, but noted that, in *In re William M.*, the issue was not fully briefed:

"Based on only this limited adversarial context, resolving an issue as important as the applicability of the Post-Conviction Hearing Act in juvenile proceedings would be premature and unwise. A question of such magnitude should be fully briefed and argued by opposing parties zealously advocating the relevant arguments prior to its definitive resolution by this court. Lacking the benefit of such strong adversarial testing, this court declined to address the merits of the issue in this case. Thus, it remains an open question wisely left for another day." *In re William M*., 206 Ill. 2d at 607-08 (Kilbride, J., specially concurring).

¶ 61 Notwithstanding the lack of availability of the Act to juveniles and the limited use of a section 2-1401 petition, juveniles who have been adjudicated delinquent, like respondent in the case at bar, are not without remedy by merit of the very fact that they are, in fact, juveniles, in a system designed for their protection. The public policy of the State of Illinois is that the relationship between the court and a juvenile is that of *parens patrie* (*In re A Minor*, 205 Ill. App. 3d 480, 492 (1990)), and a court, when it perceives a substantial injustice, will intervene on the juvenile's behalf, even where the juvenile is represented by counsel (*In re Carson*, 10 Ill. App. 3d 387, 388-89 (1973)). *In re Jonathon C.B.*, 2011 IL 107750, ¶ 144 (Freeman, J., dissenting) (Where the appellate court has held the Post-Conviction Hearing Act does not apply to juveniles, and delinquency proceedings are protective in nature, " '[i]t is the public policy of this State that a court guards carefully the rights of minors, and, to this end, a court will even intervene of its own motion and take note of legitimate and substantial errors in proceedings [involving] minors even though the minors were represented by counsel.' *In re Carson*, 10 Ill. App. 3d 387, 388-89 (1973)."); accord *In re A Minor*, 205 Ill. App. 3d at 492 (The relationship between a juvenile and the court is that of *parens patrie* and it is the court's duty to act solely in the best interest of the minor and for his own protection and, to that end, a court will intervene on its own motion where there are substantial errors in proceedings involving minors.).

¶ 62                                    III. CONCLUSION

¶ 63 Like the postconviction court in the case at bar, we recognize that our hands are tied and our options limited by precedent as well as by statute. While it may be true that changes to the Juvenile Court Act as well as court opinions regarding juvenile rights signal a shift in the way the law will treat juvenile offenders in the future, our consideration of this issue requires us to consider the law as it exists today, and today, the Post-Conviction Hearing Act does not apply to juveniles.

¶ 64 In sum, respondent, who was convicted in a juvenile court proceeding, has requested a remedy via a vehicle–the Post-Conviction Hearing Act–to which he, as a juvenile offender, has no access.

¶ 65 For the aforementioned reasons, we affirm the judgment of the circuit court of Cook County.

¶ 66 Affirmed.